UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

vs.                                                              DECISION AND ORDER

SCOTT COOK,                                                 07-CR-6195 CJS

                    Defendant.

_____

**INTRODUCTION**

This matter is before the Court on the Defendant's motion to suppress

statements made by him to law enforcement on March 29, 2007 and August 24, 2007.

In regard to the defendant's application, an evidentiary hearing was held on February 8

and February 14, 2008, at which three witnesses, Investigator Kevin Garvey ("Garvey")

of the Monroe County Sheriff's Department, Special Agent Brian Korzak ("Korzak") of

Immigrations Customs Enforcement, and the defendant, Scott Cook, testified.

Additionally, certain exhibits were received into evidence. The Court has fully

considered both the testimony and exhibits. For the reasons discussed below, the

defendant's application to suppress is denied in its entirety.

**FINDINGS OF FACT**[1]

Garvey has been employed with the Monroe County Sheriff's Department for

more than twenty-one years. Since 1990 he has been assigned to the Criminal

Investigation Section, and has held the rank of investigator since 1995. On March 29,

2007, pursuant to his duties with the Monroe County's Sheriff's Department, Garvey

went to 247 Lycoming Road located in Henrietta, New York to execute a search warrant

at that address and to speak to the defendant, Scott Cook, regarding allegations of

sexual abuse. The search warrant, warrant application, and two supporting depositions,

which were attached to the application, one from an individual named Ashley[2] and the

other from an individual named Jennifer,[3] were received into evidence as Exhibits # 4,

# 5, # 6, and # 7 respectively. Garvey had taken the sworn statement, received into

evidence as Exhibit # 7, from Jennifer on March 23, 2007, and he had taken the sworn

statement, received into evidence as Exhibit # 6, from Ashley on March 26, 2007.

Ashley, as indicated in Exhibit # 5, the warrant application at ¶ 8A,  was born on

February 16, 1989, and as indicated on Exhibit # 6, the defendant's date of birth is

---

[1]In reaching  its Findings of Fact, the Court determined that the defendant was not a credible witness. In this regard, the defendant testified that the written statement he signed on March 29, 2007 was not true. He claimed that he only said the things contained in the statement because he thought that, if he did not, Garvey would not let him go home. However, the defendant himself testified that, prior to leaving his residence at 247 Lycoming Road, Garvey specifically told him that he was not going to be arrested that day and that he would, in fact, be brought home after the interview was completed. Additionally, as to his interview with Korzak, the defendant testified that he lied to Korzak to be consistent with what he maintains was the false written statement previously given to Garvey. According to the defendant his logic for doing so, was that he believed that Korzak would then let him go home, even though Korzak, upon locating the defendant at Rochester General Hospital told him that he was under arrest, explained the charges, and actually showed him the arrest warrant.

[2]To protect Ashley's privacy, the Court will use only her first name.

[3]To protect Jennifer's privacy, the Court will use only her first name.

September 30, 1965.  In her sworn statement Ashley indicates the following:

When I was less than a year old, my mother married Scott M. Cook and he began raising me as his daughter.  My mom and Scott split up around 1992 and Scott moved out of our house.  I spent time with both my mother and Scott my whole life while I was growing up.  Around March of 2004, my mother and I weren't getting along very well so I moved in full time with Scott. At that time, Scott was living on Robert Quigley Dr. in Scottsville and I had just turned 15 years old.  After I moved in, Scott started rubbing my legs in ways that made me feel very uncomfortable.  He also had me take off my shirt so he could give me back massages and he frequently walked in on me while I was taking a shower.  I told him several times to stop and to leave me alone but he would just ignore me and keep on doing it.  I told my mother and she talked with Scott several times about this.  After she talked with him, Scott would stop doing that for about a week and then he would start all over again.

Around December of 2004, we moved out of the apartment in Scottsville and we moved in with Scott's father, Walter Cook, at his house at 247 Lycoming Road in Henrietta.  While we lived there, Scott started sneaking into my bedroom at night while I was sleeping and he started touching me over my clothing.  He progressively got worse and he started touching me underneath my clothes and my underwear.  He would touch my vagina and rub my breasts and he would masturbate himself while he was doing this.  He would also put his fingers inside of my vagina on several occasions.  Scott would come into my room almost every night and do these things.  When he came into my room, I always pretended that I was sleeping because I was scared.  I was afraid because in the past when I got in trouble, Scott would spank me and sometimes hit me with a belt.  I was afraid that if I told him to leave me alone, he would get angry and hit me.

Also, while I was living there, Scott started to give me and my friends' alcohol and we would get very drunk. Scott gave us Jack Daniels, Goldschlager, tequila, whiskey, vodka, Yagermeister and other types of alcohol. He always did this in his basement bedroom at 247 Lycoming Rd. after my grandfather went to sleep. I can recall many times during that time that my friends and I would get very drunk and my father would take naked photographs of us with his digital camera. He took pictures of us with our shirts off as well as with our pants and underwear off. I saw later on that he had loaded these pictures onto his computer that he had in his room. His computer is a Dell and is located in his bedroom.

In regard to the sworn statement of Ashley, the Court takes judicial notice[4] of the

following sections of the New York State Penal Law.

§ 130.55 Sexual abuse in the third degree

A person is guilty of sexual abuse in the third degree when he or she
subjects another person to sexual contact without the latter's consent;
except that in any prosecution under this section, it is an affirmative
defense that (a) such other person's lack of consent was due solely to
incapacity to consent by reason of being less than seventeen years old,
and (b) such other person was more than fourteen years old, and (c) the
defendant was less than five years older than such other person.

Sexual abuse in the third degree is a class B misdemeanor.

130.00 Sex offenses; definitions of terms

The following definitions are applicable to this article:

3. "Sexual contact" means any touching of the sexual or other intimate
parts of a person not married to the actor for the purpose of gratifying
sexual desire of either party. It includes the touching of the actor by the
victim, as well as the touching of the victim by the actor, whether directly
or through clothing.

§ 130.05 Sex offenses; lack of consent

1. Whether or not specifically stated, it is an element of every offense
defined in this article that the sexual act was committed without consent of
the victim.

2. Lack of consent results from:

(c) Where the offense charged is sexual abuse or forcible touching, any
circumstances, in addition to forcible compulsion or incapacity to consent,
in which the victim does not expressly or impliedly acquiesce in the actor's
conduct; or

3. A person is deemed incapable of consent when he or she is:

---

[4] "The law of any state of the Union, whether depending upon statutes or upon judicial
opinions, is a matter of which the courts of the United States are bound to take judicial notice,
without plea or proof." *Lamar v. Micou*, 114 U.S. 218, 223 (1885)

(a) less than seventeen years old; or

(d) physically helpless . . . ;

§ 260.20 Unlawfully dealing with a child in the first degree

A person is guilty of unlawfully dealing with a child in the first degree when:

2. He gives or sells or causes to be given or sold any alcoholic beverage, as defined by section three of the alcoholic beverage control law, to a person less than twenty-one years old; except that this subdivision does not apply to the parent or guardian of such a person or to a person who gives or causes to be given any such alcoholic beverage to a person under the age of twenty-one years, who is a student in a curriculum licensed or registered by the state education department, where the tasting or imbibing of alcoholic beverages is required in courses that are part of the required curriculum, provided such alcoholic beverages are given only for instructional purposes during classes conducted pursuant to such curriculum.

Unlawfully dealing with a child in the first degree is a class A misdemeanor

Garvey arrived at 247 Lycoming Road at about 5:25 p.m. on March 29, 2007 and was accompanied by other members of the Monroe County Sheriff's Department, specifically, Investigator Ponticello ("Ponticello"), Sergeant Goodman, and Deputies Davis and Sheer. Garvey was dressed in plain clothes. He was wearing a suit, tie, and overcoat, and although he was armed, his firearm was concealed. Upon arriving, Garvey and Ponticello went up on the front porch and knocked on the door and were greeted  by a man who said he was Scott Cook's father and who went and got the defendant. The defendant came onto the front porch, at which time Garvey introduced himself, displaying to the defendant his departmental badge and identification, and told the defendant that he was investigating allegations made by Ashley. Garvey explained to the defendant that he had her side of the story and now wanted to get his side of the

story regarding what had happened.  Garvey asked the defendant  if he would

voluntarily accompany him to the police station to talk about the matter. Garvey also

told the defendant that  no matter what was discussed that day that he  would bring the

defendant back home and drop him off at his residence when they  were done. Garvey

also  advised the defendant that they had a search warrant for his residence at 247

Lycoming Road, however he did not actually show him the warrant.   The defendant

responded that he would accompany Garvey to discuss the allegations, but asked if he

could first change his clothes. The defendant was allowed to do so, although Garvey,

Ponticello, and Sheer followed the defendant  to his bedroom in the basement, and

Garvey checked the defendant's clothing before he put it on. Then Garvey and the

defendant got into Garvey's vehicle and traveled about four miles  to the Zone B

substation located on Summit Drive in Henrietta. The trip  took about eight minutes, and

they arrived about 5:55 p.m. The defendant sat in the front passenger seat, and he

was not handcuffed or restrained in any way. Upon arriving at Zone B, Garvey placed

the defendant in an interview room, which was about  10 feet by 10 feet and had a

couple of chairs, a table, and a typewriter. Garvey told the defendant to have a seat and

he would get back to him shortly. At approximately 6:05 p.m. Garvey returned to the

interview room, at which time he advised the defendant of his *Miranda* warnings using a

departmental form, a copy of which was introduced into evidence as Exhibit # 1. Before

reading the defendant the five warnings exactly as they appear on Exhibit # 1, Garvey

obtained from the defendant certain information, which he recorded at the top of the

form. In that regard, the defendant indicated to Garvey that he lived at 247 Lycoming

Road, that his date of birth was September 30, 1965, that he had completed eleventh

grade but then obtained his General Equivalency Diploma ("G.E.D.") from East High

School,  and that he could read and write. After obtaining this information, Garvey read

the defendant verbatim the five warnings on Exhibit # 1. Specifically, Garvey told the

defendant:

> You have the right to remain silent.
>
> Anything you say can and will be used against you in a court of law.
>
> You have the right to talk to a lawyer and have him present while you are
> being questioned.
>
> If you can not afford to hire a lawyer, one will be appointed to represent
> you before any questioning if you wish.
>
> You can decide at any time to exercise these rights and not answer any
> questions or make any statements.

After reading the five warnings exactly as they appear on Exhibit #1, Garvey then asked

the defendant the two waiver questions printed on the form. First, Garvey asked the

defendant, "Do you understand each of these rights that I have explained to you?", to

which the defendant responded, "Yes." Next, Garvey asked the defendant, "Having

these rights in mind, do you wish to talk to us now?", to which the defendant again

responded, "Yes." Garvey recorded the defendant's responses to the two waiver

questions in the spaces provided on Exhibit # 1. Garvey then proceeded to interview

the defendant regarding the allegations made by Ashley. The interview was conducted

by question and answer. At about 8:20 p.m., Garvey asked the defendant if he would

like to provide a written statement about what they discussed. The defendant

responded that he would like to do so. Garvey began typing a statement on the

typewriter that was in the interview room, going back over his conversation with the

defendant and asking clarifying questions from time to time. The three page written statement was received into evidence as Exhibit # 2.  After he finished typing the statement, Garvey handed it to the defendant, asked him to read  out loud the typewritten portion below the pre-printed *Miranda* warnings, and also asked him if he would like to make any changes or add anything.  The defendant then read the statement out loud, and he indicated to Garvey that he did not want to make any changes or additions. Garvey then asked the defendant to initial the beginning and end of each of the pages, as well as any typographical errors, and the defendant did so Garvey next asked the defendant to sign each of the three pages of the statement and put the time he was signing next to his signatures. The defendant did so, placing the time he signed, 9:30 p.m., next to each signature, and  Garvey witnessed the defendant's signature on each page. At no time while Garvey was with the defendant on March 29, 2007, did Garvey ever make the defendant any promises to get him to speak, nor did he ever threaten the defendant in any way to get him to talk. At no time did the defendant ever indicate that he did not want to speak with Garvey, nor did the defendant ever indicate that he wanted to speak to a lawyer. The defendant did not appear to Garvey to be under the influence of alcohol or drugs, and the defendant, in fact, indicated in his signed statement that he was not under the influence of either alcohol or drugs. Throughout the time he was with Garvey on March 29, 2007, the defendant was cooperative. While they were in the interview room at Zone B,  Garvey offered the defendant something to drink, but he declined the offer.

By stipulation of the parties, the defendant was arraigned in Henrietta Town Court on April 12, 2007, on a charge of rape in the first degree in violation of section

130.35(2) of the New York State Penal Law. Defendant's counsel in the subject case,

Robert Slocum, Esq., appeared at the arraignment on behalf of the defendant. The

Court takes judicial notice of New York State Penal Law § 130.35 (2) which reads as

follows: "A person is guilty of rape in the first degree when he or she engages in sexual

intercourse with another person who is incapable of consent by reason of being

physically helpless." The Court further takes judicial notice of subdivisions one and

seven of New York State Penal § 130.00. Subdivision one explains that sexual

intercourse "has its ordinary meaning and occurs upon any penetration, however slight."

Subdivision seven states that " 'Physically helpless' means that a person is

unconscious or for any other reason is physically unable to communicate unwillingness

to an act."

Korzak is employed with the United States Immigration and Customs

Enforcement ("ICE") as a criminal investigator, and has been so employed since March

of 2000. Pursuant to his responsibilities with ICE, he had occasion on August 24, 2007,

to go to Rochester General Hospital located at 1425 Portland Avenue in the city of

Rochester to execute a federal arrest warrant on the defendant, Scott Cook.  The

warrant accused the defendant  of possession of child pornography in violation of 18

U.S.C. § 2252A(a)(2), receipt of child pornography in violation of 18 U.S.C. §

2252A(a)(5)(B), and production of child pornography in violation of 18 U.S.C. § 2251(a).

Korzak was accompanied by ICE special agents, Glor and Della Penta.  All three

agents  drove to Rochester General in one vehicle, arriving at the hospital at

approximately 9:30 a.m. Upon their arrival, they went to the Human Resource

Department to verify that the defendant was working at the hospital, and from there

went to the Maintenance Department where the defendant was assigned. At the Maintenance Department, Korzak first met with the defendant's supervisor.  Korzak then introduced himself to the defendant and showed the defendant his credentials. Korzak explained to the defendant that he had a warrant for his arrest and that the defendant had to accompany him. Korzak showed the defendant the arrest warrant and told him what the charges were. The defendant asked Korzak a couple of  questions, including whether he would be able to call an attorney. At the same time, however, the defendant's supervisor was speaking to Korzak, requesting that they not walk the defendant out of the hospital in handcuffs, so Korzak told the defendant to wait on his questions until they got outside. Korzak, Glor and Della Penta, accompanied by the defendant's supervisor, then walked the defendant, who was not handcuffed, outside to the agent's

 vehicle.  It took about five minutes to walk the defendant outside. Once at the vehicle, Korzak searched the defendant and patted him down to make sure that he did not have any weapons. The defendant was then handcuffed behind his back and placed in the rear of the agents' vehicle. Korzak drove and either Glor or  Della Pinta sat in the back with the defendant while the other sat in the front passenger seat. Once inside the vehicle,  Korzak proceeded to advise the defendant of his *Miranda* warnings using his federal law enforcement training center federal *Miranda* warning card to assist him. Korzak read him the warnings exactly as they appear on the card, a copy of which was received into evidence as Exhibit # 8. Korzak told the defendant:

You have the right to remain silent.

Anything you say can be used against you in a court of law.

You have the right to consult with an attorney and have them [*sic*] present during questioning.

If you can not afford an attorney, one will be appointed to represent you prior to any questioning.

Korzak then asked the defendant the two waiver questions as they appear on Exhibit # 8. Specifically, Korzak asked the defendant, "Do you understand your rights," to which the defendant responded, "Yes." Korzak then asked he defendant, " Are you willing to waive these rights and talk to me," to which the defendant again said, "Yes." Korzak then  asked the defendant if he would be willing to look at some pictures and  answer some  questions,  and the defendant  said that would, and that he wanted to cooperate with the agents. However, prior to actually questioning the defendant, Korzak drove to the hospital's security office to take care of a parking ticket that had been placed on the vehicle while he, Glor, and Della Penta were inside the hospital. After Korzak returned to the vehicle from the security office, he asked  Glor and Della Penta if they had made any conversation with the defendant, and they replied that they had not. Korzak then proceed to drive to the Federal Building. The drive took about ten minutes and they arrived at about 10:30 a.m. While en route, Korzak questioned the defendant concerning the victim Ashley. The substance of Korzak's conversation with the defendant that occurred during the drive to the Federal Building is detailed in his report, received into evidence, as Exhibit # 3. Upon arriving at the Federal Building, Korzak, Glor, and Della Penta escorted the defendant to a  fourth floor office, where his handcuffs were removed from behind his back, one hand was left free, and the other

was cuffed to ring on a chair. Over approximately the next ten minutes, while waiting for

the defendant to be called for  his initial court appearance, Korzak continued to speak

to him about pictures he had taken of the victim Ashley when she was under 18 years

of age. The substance of Korzak's conversation with the defendant that occurred at the

Federal Building is also detailed in his report Exhibit # 3 As indicated in this report, at

the point Korzak asked the defendant  if he would be willing identify, on Korzak's laptop,

certain images as to when and where they were taken, the defendant said he would,

but that he thought  he should call his attorney first. At that point, which was

approximately 10:45 a.m.,  Korzak terminated the interview and gave the defendant his

cellular phone, which had been confiscated at the hospital, back to him,  and allowed

him to call his attorney. At no time on August 24, 2007 did Korzak, Glor, or Della Penta

ever threaten the defendant or make him any promises to get him to speak to them.

The defendant was at all times cooperative and never refused to answer questions. The

defendant responded to the questions that were asked and never indicated that he had

any trouble understanding English. The defendant did not appear to be sick or injured,

nor did he ever complain about being sick or injured. The defendant never made any

requests. The defendant did not appear to be under the influence of either alcohol or

drugs. Although, as preciously indicated, the defendant, while in the Maintenance

Department,  asked Korzak if he would be able to  call a lawyer, he did not repeat his

question one he was outside the hospital, and, in fact,   after being advised of his

*Miranda* warnings, including his right to counsel, indicated he understood his rights and

that he was willing to waive his rights and speak to Korzak. Moreover, the defendant,

after being given his *Miranda* warnings and waiving his rights never said anything about

a lawyer until Korzak asked him to view pictures on his laptop, at which point the interview ceased.

## CONCLUSIONS OF LAW

**Suppression of Statements**

The defendant maintains that statements both oral and written that he made to Garvey on March 29, 2007 must be suppressed for two reasons. First, he argues that they must be suppressed, since he was subjected to a custodial interrogation without probable cause.  Second, he maintains they were, in any event, not voluntary, since:

> 8. Investigator Garvey advised your deponent of the allegations which were being made as to alleged conduct by your deponent towards an alleged victim, and when your deponent indicated a hesitancy to discuss the matter, Investigator  Garvey informed your deponent, in sum and substance, that unless your deponent cooperated and gave a statement your deponent would be placed under arrest.

> 9.  Your deponent agreed to discuss the matter, and during the next four hours Investigator Garvey repeatedly rephrased the statements made by your deponent, implying that your deponent was being less than truthful or in fact lying.

> 10.  Again, repeatedly during the questioning, your deponent was accused by Investigator Garvey or other officers of the Monroe County Sheriff's Office of not being truthful.

> 11. The officers rephrased statements made by your deponent and your deponent was advised that the revised statements were correct.

> 12. Your deponent was advised by Investigator Garvey that he was not going to be allowed to leave the custody of the officers until and unless he made a statement.

> 13. Your deponent agreed to make the statement, and the written statement that your deponent signed was drafted by Investigator Garvey rephrasing what your deponent stated.

> 14. Investigator Garvey advised your deponent that the revision of his statements was necessary to, in sum and substance, correctly state what

occurred.

15. That the written statement which was prepared was completed by Investigator Garvey taking statements made by your deponent and rephrasing the statements, and then asking your deponent if the rephrased statement was not actually closer to the truth.

16. Based upon the statements made to your deponent by Investigator Garvey as to your deponent's ability to leave the substation, your deponent agreed to there phrasing and revisions of his statements.

17. Your deponent agreed to sign the statement which was prepared solely based upon the fear of not being able to leave the substation.

(Affidavit of Scott Cook in Support of Motion to Suppress, January 30, 2008.) The Government opposes suppression, arguing that probable cause existed, or alternatively, was not necessary, because the defendant was not in custody, and further that any statements he made were voluntary in all respects.

As to any statements made to Korzak on August 24, 2007, the defendant offers three bases for suppression. First, he argues that his right to counsel had attached in connection with related state charges,  and consequently could not be waived absent the presence of counsel.  Second, he contends that the statements were obtained after he specifically invoked his right to counsel. Finally, he maintains that the statements were not voluntary, because he " was lead to believe that cooperation could result in his returning to work that day." Affidavit of Scott Cook in Support of Motion to Suppress, February 13, 2008, ¶ 10. The government counters that the defendant's right to counsel did not attach in connection to the state charges, that the defendant did not unequivocally invoke his right to counsel, and that any  statements  the defendant  made were voluntary.

While not raised by the defendant in his motion to suppress statements or in his affidavits submitted in support of his application, or by defense counsel on the record when

the Court attempted to clarify the bases for suppression, the defendant, in counsel's post-hearing memorandum of law, now presents for the first time the following issue: "With respect to the taped telephone conversation of undisclosed date did the Government, by a preponderance of evidence, establish that any statements made were not taken in violation of the defendant's *Miranda* Rights?" (Memorandum of Law in Support of the Defendant's Motion to Suppress Statements at 2.) This is an apparent reference to the fact that on March 26, 2007, before the defendant was contacted by Garvey on March 29, 2007, Ashley, at the direction of the Monroe County Sheriff's Department, engaged the defendant in a telephone conversation and consented to the recording of the conversation. The contention of the defendant that the statements the defendant made during the course of the conversation should be suppressed because they were obtained in violation of the his *Miranda* rights is totally without merit. In order for a defendant  to invoke the *Miranda* protections, a  custodial situation is required. *Alexander v. State of Conn.*,  917 F.2d 747, 750 -51 (2d Cir. 1990).  The defendant can not seriously argue that he was in custody at the time his conversation with Ashley was recorded. Therefore, the Court determines that the defendant's recorded, out-of-custody statements to Ashley, made prior to the filing of any charges against him and prior to any representation by counsel, are admissible. *Michigan v. Jackson*, 475 U.S. 625, 632 (1986).

The Court now turns its attention to principles of law applicable to the defendant's motion to suppress statements he made on March 29, 2007 and August 24, 2007. In *Dunaway v. New York,* 442 U.S. 200 (1979), the Supreme Court suppressed statements where the defendant had been held in custody in a police station and questioned on less than probable cause. The court reasoned that the police violated the Fourth and

Fourteenth Amendments, and that, consequently,  any statements obtained during the illegal detention were not admissible at trial. *Id*. at 216-219. "[P]robable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). Furthermore:

> The long-prevailing standard of probable cause protects "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," while giving "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). On many occasions, we have reiterated that the probable-cause standard is a "'practical, nontechnical conception'"that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Brinegar, supra*, at 175-176, 69 S.Ct. 1302); *see, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual context – not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S., at 232, 103 S.Ct. 2317.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *See ibid.*; *Brinegar,* 338 U.S., at 175, 69 S.Ct. 1302. We have stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," *ibid.* (internal quotation marks and citations omitted), and that the belief of guilt must be particularized with respect to the person to be searched or seized, *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).
>
> ***
>
> To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause, *Ornelas*, *supra*, at 696, 116 S.Ct. 1657. (Citations omitted).

*Maryland v. Pringle,* 540 U.S. 366, 370-72 (2003). It is well settled that probable cause is an objective standard. It either exists or it does not, and the inquiry is not whether the officer arrested the defendant for the "right" offense, but whether the circumstances, when viewed objectively, justified his conduct. *Scott v. United States,* 436 U.S. 128, 138 (1978); *United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.1998); *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir. 1987).

Even where probable cause is lacking, suppression would not necessarily be required if a defendant was not in custody at the time the statements were acquired. In determining whether a defendant is in custody , "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). As the Second Circuit has explained:

> The test for custody is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (internal quotation marks omitted).

In that regard, a defendant's subjective belief that he was not free to leave is irrelevant; rather, the question is what a reasonable person would have believed. *United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir. 1990). Moreover, the fact that a defendant may have been the focus of an investigation, is not determinative. *Beckwith v. United States*, 425 U.S. 341, 347 (1976). Furthermore, a defendant who voluntarily comes to a police station for questioning is not, without more, in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir. 1994). In any event:

> A court evaluating whether a person is in custody for *Miranda* purposes must

17

consider "the circumstances surrounding the interrogation; and ... [whether] given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

*United States v. Romaszko*, 253 F.3d 757, 760 (2d Cir. 2001) (quoting *Thompson v.*

*Keohane*, 516 U.S. 99, 112 (1995)).

Regarding the right to counsel and pending state charges, the Second Circuit

explained in *United States v. Mills*, 412 F.3d 325, (2d Cir. 2005):

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of indictment or information. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Furthermore, the Sixth Amendment right "is offense specific" which means that it cannot be invoked once for all future prosecutions. *Id.*

The government argues that under *Texas v. Cobb*, the state and the federal charges are not the same offense for Sixth Amendment purposes. Cobb held that the Sixth Amendment right to counsel does not extend to uncharged crimes unless they are the "same offense" as the charged crime. FN1 532 U.S. at 173, 121 S.Ct. 1335. In *Cobb*, the defendant confessed to a home burglary but denied knowledge of a woman and child's disappearance from the home. *Id.* at 165, 121 S.Ct. 1335. He was indicted for the burglary, and counsel was appointed to represent him. *Id.* Over a year later, Cobb's father reported to investigating officers that *Cobb* had confessed to him that he had killed the woman and child during the burglary. *Id.* After being arrested based on this information and taken into custody, Cobb waived his *Miranda* rights, confessed to the murders and, at trial, was convicted of capital murder. *Id.* at 165-66, 121 S.Ct. 1335. On appeal to the Texas Court of Criminal Appeals, Cobb argued that his confession should have been suppressed because it had been obtained in violation of his Sixth Amendment right, which, he claimed, attached when counsel was appointed in the burglary case. *Id.* at 166, 121 S.Ct. 1335.

FN1. Prior to *Cobb*, some lower courts had held that the right to counsel attached to uncharged crimes that were "factually related" to a specifically charged offense. See *United States v. Covarrubias*, 179 F.3d 1219, 1223-24 (9th Cir.1999); *United States v. Melgar*, 139 F.3d 1005, 1013 (4th Cir.1998); *United States v. Doherty*, 126 F.3d 769, 776 (6th Cir.1997); *United States v.*

*Arnold*, 106 F.3d 37, 41-42 (3rd Cir.1997); *United States v. Williams*, 993 F.2d 451, 457 (5th Cir.1993). *Cobb* rejected this approach. 532 U.S. at 167-68, 121 S.Ct. 1335.

The Supreme Court held that the Sixth Amendment did not bar the police from interrogating Cobb regarding the murders because, when he confessed to them, he had only been indicted for the burglary and, under Texas law, burglary and capital murder are not the same offense. *Id.* at 174, 121 S.Ct. 1335. The Court reasoned that when the right to counsel attaches, it encompasses offenses that, even if not formally charged, would be considered the same under the test articulated by *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which has been applied to define what is a "same offense" for double jeopardy purposes. *Cobb*, 532 U.S. at 173, 121 S.Ct. 1335.

*Id.* at 328 -329. As to the *Blockburger* test:

The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. *Gavieres v. United States*, 220 U. S. 338, 342, 31 S. Ct. 421, 55 L. Ed. 489, and authorities cited. In that case this court quoted from and adopted the language of the Supreme Court of Massachusetts in *Morey v. Commonwealth*, 108 Mass. 433: "'A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.' Compare *Albrecht v. United States,* 273 U. S. 1, 11, 12, 47 S. Ct. 250, 71 L. Ed. 505, and cases there cited. Applying the test, we must conclude that here, although both sections were violated by the one sale, two offenses were committed.

*Blockburger v. U.S.*  284 U.S. 299, 304 (U.S.1932).

Regarding the invocation of the right to counsel:

Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S., at 178, 111 S.Ct., at 2209. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of

19

questioning. *See ibid.* ("[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards*"); *Edwards v. Arizona*, *supra*, 451 U.S., at 485, 101 S.Ct., at 1885 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added).

Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) ("[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted)

.                                        ***

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions.

*Davis v. United States*, 512 U.S. 452, 459-462 (1994). However, as to the right to counsel,

"Doubts must be resolved in favor of protecting the constitutional claim,"   *Michigan v.*

*Jackson,*   475 U.S. 625, 633 (1986),and a suspect's responses to further questioning

cannot be used to cast doubt upon the adequacy of his initial request. *Smith v. Illinois*, 469

U.S. 91, 97-99  (1984) (per curiam).

Finally, it is well settled the government may not use any statements obtained from

a defendant, whether exculpatory or inculpatory, which were the product of custodial

20

interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring,* 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981).  Additionally, it is well settled that a defendant' statements must be voluntary based on the "totality of the circumstances."  *Miller v. Fenton*, 474 U.S. 104, 112 (1985).  A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne.  *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963).  The Government bears the burden of proving by a preponderance of the evidence both that a defendant, having been advised of his constitutional rights guaranteed under *Miranda*, knowingly, intelligently and voluntarily waived his rights, and that any statements that he made were voluntary.  *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972).

## A.    Statements of March 29, 2007

At the outset, the Court concludes by a preponderance of evidence that probable cause existed to believe that the defendant committed the crimes of sexual abuse third degree and unlawfully dealing with a child first degree in violation of New York State law. Prior to making contact with the defendant on March 29, 2007, Garvey had obtained a sworn statement from Ashley, in which, as set forth above,  she indicated that in December of 2004, when she was fifteen, the defendant put his fingers inside of her vagina on several occasions, rubbed her breasts, and  masturbated himself while doing so. Additionally, as also set forth above,  she detailed in her sworn  statement that  at a time when she was clearly under eighteen years of age, the defendant  provided her with alcoholic beverages and also took naked pictures. Consequently, there can be no serious dispute that,  on

March 29, 2007, before Garvey went to 247 Lycoming Road, the facts and circumstances of which Garvey had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that a crime had been committed. *Brinegar v. United States*, 338 U.S. at, 175-76.[5]

Additionally, the Court finds by a preponderance of evidence that the defendant was advised of his *Miranda* rights, understood his rights, and voluntarily waived his rights. After Garvey read the defendant his *Miranda* warnings verbatim as they appear on Exhibit # 1, the defendant, who was forty-one, had obtained his G.E.D. and told Garvey that he could read and write, acknowledged that he understood his rights, and that he agreed to give up his rights and speak with Garvey. At the time he did so, he did not appear to Garvey to be under the influence of alcohol or drugs, and in fact, indicated that he was not under the influence of alcohol or drugs in the statement that he subsequently signed. Moreover, at the time the defendant agreed to talk to Garvey, he knew exactly the subject about which Garvey wanted to speak.

Furthermore, the Court finds by a preponderance of evidence that the defendant's statements to Garvey, both oral and written, were voluntary in all respects. About four hours elapsed from the time Garvey introduced himself to the defendant at 247 Lycoming Road until the time the defendant signed the written statement, Exhibit # 2. During that period, Garvey neither threatened the defendant in any way nor made him any promises to get him to talk. In this regard, the Court specifically rejects as not credible, the

---

[5]Having determined that, prior to Garvey's interview of the defendant on March 29, 2007, probable cause existed to believe the defendant had committed a crime, the Court need not address the government's alternative argument that the interview was non-custodial in nature.

defendant's claims that Garvey told him that he would not be allowed to leave the Zone B substation until he gave a statement and that Garvey rephrased what he said. Furthermore, the defendant clearly was not tricked into speaking, since Garvey, at the outset, candidly advised him of the exact nature of his investigation. Moreover, the defendant did not exhibit any signs that he was intoxicated, nor was he subjected to any physical or psychological coercion.

## B.    Statements of August 24, 2007

First, the Court rejects the defendant's argument that his right to counsel had attached because of related state charges,  and therefore could not be waived absent the presence of counsel.   Applying the *Blockburger* test, discussed above, it becomes apparent that rape in the first degree in violation of New York State Penal Law Section 130.35(2), the state charge on which the defendant was represented by counsel, is a different offense than any of those crimes for which Korzak arrested the defendant, pursuant to warrant, on August 24, 2007.   As indicated above, the federal warrant authorized the defendant's arrest for violations of 18 U.S.C. § 2252A(a)(2), 18 U.S.C. § 2252A(a)(5)(B), and 18 U.S.C. § 2251(a), all felonies. These statutes in pertinent part read as follows:

> § 2252A. Certain activities relating to material constituting or containing child pornography
>
> a) Any person who--
>
> (2) knowingly receives or distributes--
>
> (A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or
>
> (B) any material that contains child pornography that has been mailed, or

shipped or transported in interstate or foreign commerce by any means, including by computer;

(5) either--

(B) knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer;

shall be punished as provided in subsection (b).

§ 2251. Sexual exploitation of children

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

Title18 U.S.C. § 2256 (8) (A) defines child pornography as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." Title 18 U.S.C. § 2256(1) explains that minor means "any person under the age of eighteen years." A comparison of the rape in the first degree statute, which is set forth above,  to each of the applicable federal statutes leads to the inescapable conclusion that  "each statute requires proof of an additional fact which the

other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Blockburger* at 304. Consequently, the Court finds that, although the defendant was represented by counsel on a related state crime, the Sixth Amendment did not bar Korzak from interviewing the defendant on the federal charge for which he was arrested. *United States v. Mills*, 412 F.3d at 329.

The Court also rejects the defendant's argument that any statements he made to Korzak must be suppressed, since prior to making any such statements, while still inside Rochester General Hospital, he invoked his right to counsel, when he asked Korzak, "if he would be able to call an attorney."  The Court finds that this inquiry on the part of the defendant amounted only to an equivocal assertion of the right to counsel, which did not require cessation of questioning. The defendant's question lacked the clear implication of a present desire to consult with counsel. *Lord v. Duckworth,* 29 F.3d 1216, 1221(7th Cir.1994) ("An examination of the cases finding unequivocal requests for counsel leads to the conclusion that Lord's statement, on its face, was not sufficiently clear to fit in that category. *See e.g.*, *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir.1991) ('I think I should call my lawyer.'); *Robinson,* 918 F.2d at 1391 ('I have to get me a good lawyer, man. Can I make a phone call?'); *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir.1988) ('Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?'), *cert. denied*, 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990)").  As the Second Circuit observed in *Diaz v. Senkowski,* 76 F.3d 61, (2d Cir. 1996),

"if a suspect makes a reference to an attorney that is ambiguous or equivocal

25

in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*; *see also McNeil*, 501 U.S. at 178, 111 S.Ct. at 2209 ("the likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards*").

*Id.* At 64. In an analogous situation, the South Dakota district court held:

Even if the Court found Eastman's testimony to be credible, which it does not, the statement he claims he made to Norris before signing the Waiver, namely, "Can I have a lawyer"-was not an unequivocal request for counsel within the meaning of *Davis* and its progeny. *See* 2 W. LaFave, J. Israel & N. King, Criminal Procedure, § 6.9(g) at 609-12 & n. 148 (2d ed. 1999 & 2003 Supp.).

*United States  v. Eastman,*  256 F.Supp.2d 1012,1019 (D.S.D. 2003). In any event, in accordance with the Supreme Court's recommendation in *Davis*, Korzak, within approximately five minutes of the defendant's inquiry, once outside the hospital, read the defendant his *Miranda* warnings. In that regard, Korzak specifically informed the defendant, as previously indicated, that he had the right to consult with a lawyer and to have him present during questioning, and that if he could not afford a lawyer one would be appointed to represent him. Korzak then asked the defendant the two waiver questions as they appear on Exhibit # 8, to which the defendnat responded yes to both, thereby waiving his rights, including his right to counsel.

Next the Court considers the defendant's contention that his statements to Korzak must be suppressed as involuntary because he "was lead to believe that cooperation could result in his returning to work that day."  (Affidavit of Scott Cook in Support of Motion to Suppress, February 13, 2008, ¶ 10.)  However, despite making this sworn statement in his affidavit, the defendant testified at the hearing on this issue as follows:

Q. But no one ever said anything to you about being released; isn't that correct?

26

A. Not this time, no.

Q. And no one made you any promises with respect to any cooperation; isn't that correct?

A. None that I know of.

(Hearing Transcript, February 14, 2008, at 128.) The defendant's affidavit in support of his motion to suppress the August 24, 2007, statements is clearly at odds with his hearing testimony.

In any event, the Court finds by a preponderance of evidence that the defendant was advised of his *Miranda* rights, understood his rights, and voluntarily waived his rights. This was the second time in less than five months that the defendant, who was forty-one years old, had a G.E.D., and could read and write,  was advised of his *Miranda* warnings After being so advised by Korzak of his rights as they appear on Exhibit # 8,  the defendant acknowledged that he understood his rights,  and he agreed to give up his rights and speak with Korzak. At the time he did so, he did not appear to be under the influence of alcohol or drugs, nor did he appear to be sick or injured, nor did he ever complain about being sick or injured. The defendant never made any requests. Additionally, at the time the defendant agreed to speak with Korzak, he knew exactly the subject about which Korzak wanted to speak.

Furthermore, the Court finds by a preponderance of evidence that the defendant's statements to Korzak were voluntary in all respects. As the defendant himself acknowledged at the hearing, neither Korzak or anyone else made him any promises to get him to talk. Nor did Korzak or anyone else threaten the defendant to get him to speak. Further, the  defendant was not tricked into making a statement, since, at the time he was

arrested, Korzak  showed him the arrest warrant and told him what the charges were. Moreover, the defendant did not exhibit any signs that he was intoxicated, nor was he subjected to any physical or psychological coercion.

## CONCLUSION

Accordingly, the defendant's motion to suppress statements (Docket # 14) is denied in all respects.

IT IS SO ORDERED.

DATED:     March 17, 2008
               Rochester, New York

ENTER.

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA